UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
MARY E. FAHERTY,                              :
                                              :
                    Plaintiff,                :
                                              :
          -against-                           :          **OPINION AND ORDER**
                                              :          11-CV-02476 (DLI)
MICHAEL J. ASTRUE, COMMISSIONER               :
OF SOCIAL SECURITY,                           :
                                              :
                    Defendant.                :
-------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

Plaintiff Mary E. Faherty ("Plaintiff") filed an application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act") on July 23, 2008 alleging mental and physical disability as of June 13, 2002. Plaintiff's application was denied and she filed a written request for a hearing. On May 27, 2010, Plaintiff appeared with counsel and testified at a hearing held before Administrative Law Judge Hazel C. Strauss ("ALJ"). By decision dated July 13, 2010, the ALJ found that Plaintiff was not disabled within the meaning of the Act. On March 29, 2011, the ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review.

Plaintiff filed the instant action seeking review and reversal of the denial of benefits, pursuant to 42 U.S.C. § 405(g). (Complaint, ("Compl."), Doc Entry No. 1.) Plaintiff moved for judgment on the pleadings, or, in the alternative, remand for a new hearing. (Pl.'s Mot. for J. on the Pleadings, Doc. Entry No. 18.) The Commissioner moved for judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c), seeking affirmation of the denial of benefits. (Def.'s Mot. for J. on the Pleadings, Doc. Entry No. 15.) For the reasons set forth below, the Commissioner's motion for judgment on the pleadings is denied and Plaintiff's motion for judgment on the

pleadings is granted to the extent that the matter is remanded for further administrative proceedings consistent with this opinion.

## BACKGROUND

### A.    Non-Medical and Self-Reported Evidence

Plaintiff was born on January 18, 1966.  (R. 34.) [1]  Plaintiff completed Ireland's equivalent of a high school education, but did not receive a diploma due to low exam scores.  (R. 37.)  She last worked between 1995 and 1996, but did not earn a sufficient amount for it to be considered past relevant work for Social Security purposes.  (R. 38.)  She is married with four minor children.  (R. 35.)  She has a fifth child from a previous marriage, who is over eighteen years old and does not live with her.  (R. 52.)  Plaintiff's physical limitations in her spine and shoulders are associated with a car accident she suffered in 1996.  (R. 41.)  Plaintiff alleges she is disabled and cannot work because of her depression and anxiety, which includes feelings of withdrawal and isolation, hallucinations, and being unable to concentrate and remember.  (R. 38-39, 55.)

### B.    Medical Evidence

1.    <u>Physical Medical Evidence</u> [2]

Plaintiff suffered a car accident on June 9, 1996 and was admitted to St. Catherine of Siena Hospital.  (R. 156.)  She dislocated two discs in her neck and had tissue damage.  (R. 40-41.)  She had an MRI of the cervical spine on August 5, 1996 at the Imaging Center of Queens,

---

[1] "R." citations are to the correspondingly numbered pages in the certified administrative record.  (*See* Doc. Entry No. 12.)

[2] Plaintiff alleges her onset disability date is June 13, 2002, as that is when she became unable to work because of her depression.  (R. 153.)  However, SSI benefits are limited to beginning, at the earliest, on the month after Plaintiff filed the application.  20 C.F.R. § 416.335 ("When you file an application in the month that you meet all the other requirements for eligibility, the earliest month for which we can pay you benefits is the month following the month you filed the application.")  Therefore, for the purposes of determining Plaintiff's SSI benefits, her onset date is July 23, 2008.  (Pl. Mem. at 1 n.1.)  The medical evidence in the record has been summarized below.  There are gaps between 1996 and 2008, but because the onset date is July 23, 2008, the Court has focused on the portions of the record as it relates to the issues raised in this appeal.

which showed a herniated disc at C5-C6. (R. 391.) Plaintiff additionally had an EMG/NCV study done on August 27, 1996, which showed results compatible with bilateral cervical radiculopathy. (R. 393-94.) The same test conducted on September 3, 1996 showed abnormal results compatible with left lumbosacral radiculopathy. (R. 392.)

Plaintiff has seen her primary care physician, Dr. Sachel Badlani, M.D., since 2002. (R. 184.) In a November 25, 2003 progress note, Dr. Badlani stated that Plaintiff had a history of depression for which she was taking valproic acid. (R. 276; *see also* R. 265-66, 272-73 (notes and reports from 2004 and 2005, including 2004 report that Plaintiff was taking Depakote).) Plaintiff also saw Dr. Adina Pinkas, M.D, a physician in Dr. Badlani's practice, in 2005 and 2006. Dr. Pinkas noted that Plaintiff had a past history of depression. (R. 268-72, 256-59.)

In a January 29, 2008 progress note, Dr. Badlani indicated Plaintiff complained that her "hands and feet felt numb and heavy." (R. 247.) In an April 9, 2008 progress note, Dr. Badlani indicated Plaintiff complained of neck pain, experiencing anger issues, and feeling overwhelmed. (R. 232.) In an August 20, 2008 progress note, Dr. Badlani indicated that Plaintiff complained of pain in her back and discomfort and tingling in her neck. (R. 225, 370.) He stated Plaintiff's herniated discs were being treated by a neurologist. (*Id.*) In addition, he noted Plaintiff had a history of bipolar disorder and that a letter was needed for "disability." (*Id.*) During the course of treating Plaintiff, Dr. Badlani prescribed Plaintiff the following medications: Celexa and Citalopram for depression; Depakote for bipolar disorder and mania; Tramadol for pain; and Fosamax for osteoporosis. (R. 157, 271, 273.) Plaintiff also took Seroquel for schizophrenia. (R. 366.)

On August 4, 2008, Dr. Ali Hazem, M.D., a neurologist, ordered a cervical MRI and a lumbosacral spine MRI. (R. 227, 369.) The cervical MRI revealed a right paramedian mild disc-

osteophyte complex at C5-C6, effacing the ventral subarachnoid space. (R. 227.) The lumbosacral spine MRI was negative. (R. 369.)

Dr. Scott T. Gray, M.D., orthopedic surgeon, began treating Plaintiff in November 2009. (R. 398.) On November 30, 2009, Dr. Gray reported that she had tenderness and spasms at C3, C4, C4-C5, and "almost chin-on-chest deformity." (R. 407.) He ordered a cervical MRI, which revealed: (1) spondylosis and intervertebral disc bulge at the C3-C4 and C4-C5 interspaces; and (2) spondylosis, disc herniation, and facet joint hypertrophy impinging upon the anterior spinal canal and approximating the ventral thecal sac at C5-C6. (R. 396 (MRI dated Dec. 28, 2009), 407.) On May 3, 2010, Dr. Gray observed that Plaintiff had severe pain in her cervical spine and tenderness at C3-C4 and C6-C7. (R. 406.) She had positive Soto-Hall results and lower back pain at L4-L5. (*Id.*).

### a. Treating Physician's Spinal Impairment Questionnaire

Dr. Gray completed a Spinal Impairment Questionnaire on May 3, 2010 and noted a "poor" prognosis. (R. 397-404.) He diagnosed Plaintiff with cervical disc disease, spinal spondylosis, schizophrenia, bipolar disorder, and severe depression. (R. 398.) Dr. Gray stated that Plaintiff had tenderness at C3-C4, muscle spasms in the cervical spine, reflex changes at C5, muscle atrophy at the left forearm, and muscle weakness at C4-C5. (R. 399.) Plaintiff also had a positive bilateral straight leg raising test. (*Id.*) Dr. Gray noted the MRI supported his diagnosis and Plaintiff's symptoms included sharp, constant and severe pain in her spine and spasms. (R. 400.) The pain was caused by sitting, standing, bending, and squatting. (R. 401.)

Dr. Gray opined that, in an eight-hour day, Plaintiff could only sit for one hour, stand for two hours, and walk for two hours. (*Id.*) It was "necessary or medically recommended" for Plaintiff not to sit, stand, or walk continuously in a work setting. (*Id.*) Dr. Gray opined Plaintiff

could lift and carry under five pounds frequently and five to ten pounds occasionally, but could never lift and carry over twenty pounds. (*Id.*) Plaintiff was taking Naprosyn, Motrin, and Tylenol. He opined she was in constant pain, the ongoing impairments would last at least twelve months, and her depression contributed to the severity of her symptoms and functional limitations. (R. 402.) Dr. Gray stated Plaintiff was incapable of enduring even "low stress" in a work environment, because of her mental health issues. (R. 403.)

Dr. Gray also opined that in a work setting: (1) Plaintiff had to take unscheduled breaks during an eight-hour workday; (2) her neck pain interfered with her ability to use a computer; (3) she could not sustain a full-time competitive job requiring activity on a sustained basis; (4) her impairments were likely to produce "bad days only;" (5) she would need to be absent from work as a result of the impairments or treatments more than three times a month; and (6) she should avoid pushing, pulling, kneeling, bending, and stooping. (R. 403-04.)

   *b.*  *Consulting Physician's Physical Impairment Evaluation*

On October 13, 2008, Dr. Louis Tranese, D.O., performed a consultative physical examination of Plaintiff. (R. 278-81.) Dr. Tranese found that Plaintiff had a normal gait, appearance, behavior, and station. (R. 279.) He found only mild, vague, bilateral cervical, paravertebral tenderness when examining her cervical spine and no impairments in her thoracic and lumbar spines. (R. 280.) Plaintiff had a full range of motion and no impairments in her upper and lower extremities. (*Id.*) In his Medical Source Statement, Dr. Tranese reported that Plaintiff may have moderate limitations with lifting heavy objects, especially overhead. (*Id.*) Plaintiff had mild to moderate limitations with frequent bending and mild limitations with sitting or standing for long periods, as this may have aggravated her neck pain. (*Id.*) Dr. Tranese opined Plaintiff had "no other physical function deficits." (*Id.*)

*c.      Physical Residual Functional Capacity Assessment*

Naomi Jones, a disability examiner, prepared Plaintiff's Physical Residual Functional Capacity Assessment ("RFC") on November 25, 2008, which reported some exertional limitations.  (R. 307-12.)  The report stated that Plaintiff occasionally could lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour workday, and push or pull unlimitedly (other than the limitation as to lifting and/or carrying).  (*Id.*)  Postural limitations included Plaintiff's ability to climb, stoop, kneel, crouch, and crawl occasionally.  (R. 309.)  Ms. Jones found no manipulative, visual, communicative, or environmental limitations.  (*Id.*)  Ms. Jones concluded that, "overall, the information in file indicates [Plaintiff's] statements are credible but not to the degree alleged."  (R. 311.)

2.      <u>Psychological Medical Evidence</u>

Once a month, since September 2008, Plaintiff has treated with Dr. Hasina Haroon, a psychiatrist at Bleuler Psychotherapy Center.  (R. 321; *see also* R. 356-66 (Psychiatric Notes and Medication Records dated Oct. 18, 2008 to Feb. 27, 2010).)  In a September 9, 2008 intake form, a social worker noted Plaintiff complained of panic attacks, sleeplessness, depression, and anxiety.  The social worker observed Plaintiff had difficulty concentrating.  (R. 324-32.)  The social worker noted Plaintiff had a history of drug and alcohol abuse, for which she went to a treatment program in 2001.  (R. 328; *see also* R. 335.)  The initial diagnosis was: Axis I – Depressive D/O, not otherwise specified ("NOS") 311 and Anxiety D/O NOS 300.00; Axis II – Deferred; Axis III – Herniated neck disc; Axis IV – small social support network; and Axis V: 50.  (R. 329.)  In October 18, 2008 notes, Dr. Haroon additionally diagnosed Plaintiff with bipolar disorder and schizoaffective disorder, and recommended psychotherapy and that she continue to take Depakote, Celexa, and Seroquel.  (R. 338-39.)  Dr. Haroon noted Plaintiff had

fair attention, concentration, and memory, but limited insight and judgment. (*Id.*) Plaintiff complained of getting irritated and hearing voices. (R. 334.)

On November 1, 2008, Dr. Haroon reported Plaintiff was "doing better" and denied suicidal ideation. (R. 366.) On December 1, 2008, Dr. Haroon reported Plaintiff complained she was still depressed. (R. 365.) On January 24, 2009, Dr. Haroon replaced Celexa, which Plaintiff took for depression, with Prozac and added Ambien for her sleep issues. (R. 364.) From February 21, 2009 through January 30, 2010, Plaintiff told Dr. Haroon she was doing "ok" and denied being depressed or having suicidal or homicidal ideation. (R. 356-64.) In a March 3, 2010, letter, Dr. Haroon opined that Plaintiff was totally disabled and drug and/or alcohol use was "not a material cause of this individual's disability. (R. 409.)

Plaintiff regularly attended therapy sessions at Bleuler Psychotherapy Center with Michelle Ambalu, MSW, beginning on September 24, 2008. (*See* Mem. of Law in Supp. of Pl.'s Mot. for J. on the Pleadings ("Pl. Mem.") at 2, Doc. Entry No. 19.) As of October 21, 2011, she continued to see Ms. Ambalu. (*Id*.) On September 8, 2008, Ms. Ambalu found that Plaintiff had impaired insight and impulse control, and some days had deficiency with self-care and activities of daily living. (R. 330.) Ms. Ambalu stated in her December 16, 2008 cover letter attached to the Bleuler Psychotherapy Center Intake report that Plaintiff was "unable to work and is in need of disability assistance." (R. 322.)

a.     *Treating Psychiatrist's Impairment Questionnaires*

On July 8, 2009, Dr. Haroon answered the Multiple Impairment Questionnaire, based on her treatment of Plaintiff from September 24, 2008 to June 24, 2009. (R. 200-08.) Dr. Haroon diagnosed Plaintiff with depressive disorder not otherwise specified, schizoaffective disorder, and anxiety disorder. (R. 201.) Clinical findings included panic attacks, auditory and visual

hallucinations, mania, depressive symptoms, and paranoia ideation. (R. 201.) Dr. Haroon stated that, in general, Plaintiff's ability to sustain concentration and persistence was only mildly limited and did not significantly affect her activity. (R. 204-05.) However, she determined Plaintiff's ability to maintain attention and concentration for extended periods was moderately limited. (R. 204.) She reported that Plaintiff's ability to complete a normal work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods was markedly limited, such that it effectively precluded Plaintiff from performing the activity in a meaningful manner. (R. 205.) Dr. Haroon additionally opined that Plaintiff's memory and ability to understand were generally mildly or moderately limited. (R. 204.) Plaintiff's ability to interact socially was moderately limited in four of the five social interactions described in the questionnaire. (R. 205.) Plaintiff's ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness were mildly limited. (*Id.*) Dr. Haroon reported that Plaintiff was both mildly and moderately limited in her ability to adapt, but found no limitations as to her ability to be aware of normal hazards and take appropriate precautions. (R. 205-06.) She determined that Plaintiff was capable of bearing low stress in a work environment, but Plaintiff was unable to be in a work environment for an extended period of time, because Plaintiff was likely to experience panic attacks. (R. 207.)

On April 1, 2010, Dr. Haroon completed a Psychiatric/Psychological Impairment Questionnaire based on her treatment of Plaintiff from October 18, 2008 to February 27, 2010. (R. 410-18.) She diagnosed Plaintiff with schizoaffective disorder-bipolar type and found her prognosis to be "fair." (R. 411.) Plaintiff's most frequent/severe symptoms were mania, depression, and anxiety; other symptoms included confusion and occasional hallucinations. (R.

413.) Dr. Haroon found that Plaintiff's symptoms "have caused her to make many errors at work or unable to work at all in the past" and "to lose part [time] jobs." (R. 416-17.) She estimated that, on average, Plaintiff was likely to be absent from work more than three times a month because of her impairments or treatments. (R. 417.) She reported that Plaintiff was prescribed the following medications for use once a day: Depakote 1000, Prozac 30, Ambien 10, and Seroquel 200. (R. 416.) She opined that the description of symptoms and limitations in the questionnaire applied, at the earliest, in the year 2000. (R. 418.)

### b. Consulting Psychologist's Mental Impairment Evaluation

On October 24, 2008, Michelle Bornstein, a psychologist, performed a consultative mental impairment examination on Plaintiff. (R. 282-86.) Dr. Bornstein observed that Plaintiff was unkempt and poorly groomed, but her gait, posture, and motor behavior were normal. (R. 283.) Plaintiff stated she had a history of alcohol and cocaine abuse and she last used in 1998, prior to completion of an outpatient treatment program. (*Id.*) The evaluation revealed no evidence of hallucinations, delusions, or paranoia. (*Id.*) Dr. Bornstein found that Plaintiff was mildly impaired as to attention, concentration, and recent and remote memory skills. (R. 284.) She found Plaintiff's cognitive function to be "in the borderline range," and that her "[g]eneral fund of information appears to be somewhat limited." (*Id.*) Dr. Bornstein opined that Plaintiff could follow and understand simple instructions and perform simple tasks independently, but had some difficulty concentrating. *Id.* She also stated that Plaintiff would "likely have difficulty relating adequately with others." (R. 285.)

### c. Mental Residual Functional Capacity Assessment

Robert F. Lopez, Ph. D., performed a Mental Residual Functional Capacity Assessment for Plaintiff on November 18, 2008. (R. 301-05.) He found no significant limitation with

Plaintiff's memory and ability to understand, except a moderate limitation with the ability to understand, remember, and carry out detailed instructions. (R. 301.) He found moderate limitation with Plaintiff's ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, and work in coordination with, or in proximity to, others without being distracted by them. (*Id.*) Additionally, Dr. Lopez found moderate limitation with Plaintiff's ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 302.) While Plaintiff was moderately limited as to most social interactions, he found her significantly limited in her ability to ask simple questions or request assistance. (*Id.*)

## C. The Hearing

### 1. Plaintiff's Testimony

On May 27, 2010, Plaintiff, represented by counsel, testified at a hearing before the ALJ concerning her disability claim. (R. 30-80.) Plaintiff testified to a series of physical, emotional, and psychiatric issues, including physical limitations that prevented her from heavy lifting or stretching. (R. 41.) Plaintiff testified that her physical limitations were associated with an accident she suffered in 1996. (*Id.*) She stated the discomfort and pain "wasn't so bad" at the time of the accident; however, in the last few years, she began feeling spasms up her left side and behind her ear and the pain spread from behind the neck bone area to the back of her head. (R. 41.) She also felt weight on both shoulders as though she were carrying another person. (*Id.*) Pain prevented her from stretching tasks, like changing light bulbs, and she could not stand longer than thirty minutes. (R. 41, 47.) Plaintiff stated that sitting also created discomfort, which the ALJ acknowledged during the hearing in allowing her to change positions. (R. 48.)

Plaintiff testified that she could do some housework, including cooking, sweeping, mopping, washing the dishes, and making her bed; however, she could not do heavy lifting or laundry. (R. 44.) Her husband did the laundry and helped with tasks around the house. (R. 43-44.) Plaintiff had a driver's license, but only drove about once a week. (R. 36.) Plaintiff testified that she did not drink alcohol or use illegal drugs, and had not had alcohol for around twelve years. (R. 46, 51.)

Plaintiff testified she could not work because she suffered from depression and preferred to spend time alone. (R. 38-39.) Plaintiff explained that she had problems getting along with others, such as other parents at her children's school, and avoided interacting with people because she became irritable. (R. 49-50, 55, 57.) Plaintiff frequently felt overwhelmed and had "dark thoughts," including hallucinations, and heard voices. (R. 38-39, 53-54.) She described sleeping poorly and being constantly fatigued. (R. 54.) She gained 40-45 pounds in the last few years, which she attributed to her medication, depression, and stress. (R. 35.) Plaintiff could groom herself, but lacked the desire to do so, and often went out in public and to her children's school in her pajamas. (R. 57-58.) She also had problems with short-term memory and concentration. (R. 55.)

2.    Vocational Expert Testimony

During the hearing, the ALJ consulted a vocational expert ("VE"), Esperanza J. DiStefano, to help determine whether jobs were available in the national economy based on Plaintiff's age, education, work experience, and RFC. (R. 58-79.) The ALJ gave the VE several hypotheticals. First, the ALJ posed the hypothetical of a 44-year-old individual, with an education in Ireland through the 12th grade, and no past relevant work. (R. 60.) She had the ability to perform a range of light work with the following limitations: lift only twenty pounds

occasionally and five pounds frequently, sit six out of eight hours, stand and walk six out of eight hours, sit and one-half hour at a time, and no problem walking. (*Id.*) In addition, she should be able to perform work tasks alone and not as part of a team, because she had difficulty relating with others. (*Id.*) The work should be simple and low-stress, because she had trouble dealing with stress. (R. 60-61.) The VE testified that she looked for sedentary positions that did not require contact with the public and were low-stress, but could not identify a job within the parameters of that hypothetical. (R. 61, 64.)

In the next hypothetical the ALJ posed, she increased the ability to lift and carry up to ten pounds occasionally. (R. 64.) The VE then identified the following positions: 1) mail clerk (Dictionary of Occupational Titles ("DOT")[3] 209.687-026), 137,350 employed nationally, 11,820 in-state, 2,240 in the New York Metropolitan area; 2) housekeeper/cleaner (DOT 323.687-014), 917,120 employed nationally, 46,850 in-state, 5,000 in the New York Metropolitan area; and 3) assembler (DOT 706.687-010), 499,870 employed nationally, 18,090 in-state, 2,910 in the New York Metropolitan area. (R. 65.)

In the last hypothetical the ALJ posed, she added limitations on pushing and pulling with the upper extremities, and kneeling, bending, and stooping. (R. 65-66.) The VE then eliminated the housekeeping position and the mail clerk position, because, in her experience, these jobs required pushing or pulling. (R. 66.) The ALJ asked whether the position of courier would qualify. (*Id.*) The VE testified that according to the DOT, the job would qualify because no pushing or pulling was described in the narrative, but pushing or pulling was required based on the VE's observations of persons performing the job. (R. 67-69.) The ALJ then asked whether pushing and pulling were part of the description for mail clerk in the DOT. (R. 69-70.) The VE admitted that, as described in the DOT, an individual with limitations as to pushing and pulling

---

[3] Dictionary of Occupational Titles (4th Ed. Rev. 1991).

could perform the work of mail clerk and courier.  (R. 70.)  However, when questioned by Plaintiff's attorney, the VE maintained that she had observed messengers, couriers, mail clerks, and housekeepers/cleaners "push things," such as carts, in the course of performing their duties. (R. 78.)  She also testified that VEs relied on other sources besides the DOT to help them make their decisions about particular job duties.  (R. 71.)

## D.    Evidence Submitted to the Appeals Council

Plaintiff submitted to the Appeals Council several examination reports dated after her hearing before the ALJ.  On August 2, 2010, Dr. Gray examined Plaintiff's spine and found tenderness at C3-C4 and in the lumbar spine at L3-L4, as well as mild tenderness in the right and left sacroiliac ("SI") joints.  (R. 420.)  In a January 31, 2011 letter from Dr. Gray, he reported that Plaintiff had tenderness at C3-C4, C4-C5, and a positive Soto-Hall test, which indicated a possible cervicothoracic sprain, strain, or flexion teardrop fracture.  (R. 421.)  Plaintiff also had a positive bilateral Tinel's sign, which may indicate nerve compression.  (*Id.*)  Dr. Gray opined that Plaintiff could not engage in activities that include lifting, pushing, or pulling more than ten pounds or walking for more than fifteen minutes.  (*Id.*)  Plaintiff also had chronic pain in her cervical spine, which did not improve despite change in medication, therapy, or avoiding certain activities.  (*Id.*)

In a February 1, 2011 Letter of Disability from Dr. Badlani, he stated that Plaintiff suffered from minor depression and anxiety disorder, as well as spinal stenosis, cervical radiculopathy, and lumbar radiculopathy.  (R. 423.)  Plaintiff submitted a narrative letter from Ms. Ambalu stating Plaintiff was being treated for anxiety, depression, and anger, "as well as auditory and visual hallucinations which are often triggered by stress."  (R. 426.)  Ms. Ambalu

described Plaintiff's mental illness as "severe and persistent." (*Id.*)  She also confirmed that

Plaintiff was taking Depakote, Prozac, and Seroquel.  (*Id.*)

## DISCUSSION

### A.    Standard of Review

Unsuccessful claimants for disability benefits under the Act may bring an action in

federal district court seeking judicial review of the Commissioner's denial of their benefits

"within sixty days after the mailing . . . of notice of such decision or within such further time as

the Commissioner of Social Security may allow."  42 U.S.C. § 405(g).  A district court,

reviewing the final determination of the Commissioner, must determine whether the correct legal

standards were applied and whether substantial evidence supports the decision.  *See Schaal v.*

*Apfel*, 134 F. 3d 496, 504 (2d Cir. 1998).  The former determination requires the court to ask

whether "the claimant has had a full hearing under the [Commissioner's] regulations and in

accordance with the beneficent purposes of the Act."  *Echevarria v. Sec'y of Health & Human*

*Servs.*, 685 F. 2d 751, 755 (2d Cir. 1982) (internal citations omitted).  The latter determination

requires the court to ask whether the decision is supported by "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402

U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

### B.    Disability Claims

To receive disability benefits, claimants must be disabled within the meaning of the Act.

*See* 42 U.S.C. §§ 423(a), (d).  Claimants establish disability status by demonstrating an "inability

to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment . . . which has lasted or can be expected to last for a continuous period of not

less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The claimant bears the initial burden of proof

on disability status and is required to demonstrate disability status by presenting medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, as well as any other evidence the Commissioner may require. 42 U.S.C. § 423(d)(5)(A); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F. 2d 638, 642 (2d Cir. 1983).

ALJs must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act as set forth in 20 C.F.R. §§ 404.1520 and 416.920. If at any step the ALJ finds that the claimant is either disabled or not disabled, the inquiry ends there. First, the claimant is not disabled if he or she is working and performing "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the ALJ considers whether the claimant has a "severe impairment," without reference to age, education or work experience. Impairments are "severe" when they significantly limit a claimant's physical or mental ability to conduct basic work activities. 20 C.F.R. §§ 404.1520(c), 416.920(c). Third, the ALJ will find the claimant disabled if his or her impairment meets or equals an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's RFC in steps four and five. 20 C.F.R. §§ 404.1520(e), 416.920(e). In the fourth step, the claimant is not disabled if he or she is able to perform past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work existing in the national economy, considering factors such as age, education and work experience. If so, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 416.920(g). At this fifth step, the burden shifts to the Commissioner to demonstrate that the claimant could perform other work. *See Draegert v. Barnhart*, 311 F. 3d 468, 472 (2d Cir. 2002) (citing *Carroll*, 705 F. 2d at 642).

**C.     The ALJ's Decision**

On July 13, 2010, the ALJ issued her decision denying Plaintiff's claims.  (R. 14-26.) The ALJ followed the five-step procedure in making her determination that Plaintiff was not disabled.  (R. 15.)  At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the application date of July 23, 2008.  (R. 16.)  At the second step, she found Plaintiff had the following severe impairments: cervical disc disease, mood disorder (not otherwise specified), depressive disorder (not otherwise specified), schizoaffective disorder, anxiety disorder, and cocaine and alcohol abuse in remission.  (*Id.*)

At the third step, the ALJ concluded Plaintiff's physical impairments, in combination or individually, did not meet or equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, nor did Plaintiff's mental impairments, singly or in combination, meet or medically equal the criteria of listing 12.04.  (*Id.*)  In making that finding, the ALJ determined Plaintiff failed to satisfy the "paragraph B" and "paragraph C" criteria.  (R. 16-17.)  The criteria in paragraphs B and C describe impairment related functional limitations that are incompatible with the ability to do any gainful activity.  (*Id.*)

The ALJ determined that Plaintiff's activities of daily living were only moderately restricted because she could perform household activities, clean, shop, and drive her children to school.  (R. 17.)  She found Plaintiff had only moderate difficulty in social functioning because Plaintiff did not isolate herself, could interact with people, and used public transportation.  (*Id.*) The ALJ noted that, although Plaintiff did not socialize with her neighbors, she did speak with them, and, while Plaintiff alleged she did not have any friends, she was close with her brother and cared for her children.  (*Id.*)  The ALJ acknowledged Plaintiff testified to having difficulty

with concentration and memory, but relied on the consultative examination that reported Plaintiff's concentration and memory were only mildly impaired.  (*Id.*)

At step four, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work, as defined in 20 C.F.R. § 416.967(b), with the following additional limitations: (a) lift/carry twenty pounds occasionally and ten pounds frequently; (b) sit six out of eight hours; (c) stand and walk six out of eight hours; (d) sit and stand no more than half-an-hour at one time.  (*Id.*)  Plaintiff could walk and use her arms, hands, and fingers without any problems.  (R. 17-18.)  The ALJ found that, due to Plaintiff's psychiatric problems and difficulty relating with others, the work should be simple, low stress, performed alone instead of as a team, and not involve interaction with the general public.  (*Id.*)

The ALJ did not give significant weight to Dr. Gray's opinion or his May 3, 2010 Spinal Impairment Questionnaire.  (R. 22.)  The ALJ determined Dr. Gray's assessment that Plaintiff could sit for no more than one hour, and stand and walk for no more than two hours, was not consistent with Plaintiff's own testimony about her daily activities, which included cooking, cleaning, driving her children to school, shopping, and attending church.  (*Id.*)  The ALJ also found inconsistencies in Dr. Gray's questionnaire: "The [Spinal Impairment Questionnaire] . . . is inconsistent as he indicates a carrying limitation of 20 pounds occasionally, but a lifting limitation of only 10 pounds."  (*Id.*)  The ALJ noted Dr. Gray had seen Plaintiff only two times and neither recommended any specific treatment nor prescribed any medication.  (*Id.*)

Additionally, the ALJ did not give significant weight to Dr. Haroon's July 8, 2009 and April 1, 2010 questionnaires.  (R. 22-23.)  She found that Dr. Haroon did not specify how often Plaintiff's symptoms occurred and there was a lack of specific testing to support Dr. Haroon's finding of marked limitation as to sustained concentration.  (R. 23.)  The ALJ noted

inconsistencies between Dr. Haroon questionnaires, which were prepared nine months apart, and between the questionnaires and Plaintiff's recorded self-reports that she was "doing OK" and "denied being depressed" (R. 22-23.) In addition, the ALJ noted an inconsistency where Dr. Haroon opined Plaintiff was markedly limited as to completing a normal workweek, but only mildly or moderately limited as to other skills. (*Id.*)

The ALJ gave significant weight to the examinations of both the consulting physician and psychologist. (*Id.*) The ALJ gave the opinion of Dr. Tranese significant weight, finding he conducted a thorough examination and issued detailed findings. She noted that he examined Plaintiff only once and, while his medical source statement did not contain the terminology used in the regulations, his findings were consistent with the ALJ's RFC assessment of a range of light work. (R. 24.) The ALJ also gave significant weight to Dr. Bornstein's psychological examination results, as his assessment that Plaintiff was only mildly limited in her daily life activities was consistent with Plaintiff's testimony and the record as a whole. (R. 23.)

The ALJ found that the record did not support Plaintiff's claim that her symptoms were disabling. (R. 24.) While the ALJ believed Plaintiff suffered the symptoms she testified to, the intensity of Plaintiff's symptoms were not credible to the extent they were inconsistent with the ALJ's RFC assessment. (*Id.*) The ALJ also found that the severity of her physical symptoms were not credible, because Plaintiff was not taking strong pain medications or receiving regular treatment for her neck pain, and self-reports in Dr. Badlani's notes from February 6, 2009 to February 9, 2010, indicated Plaintiff's shoulder and neck pain were improving and her only complaint was pain during weather changes. (*Id.*)

At step five, the ALJ found Plaintiff could perform the following jobs that existed in significant numbers in the national economy: mail clerk, housekeeper/cleaner, and assembler. (R.

25.)  The ALJ noted the VE had opined that the jobs of mail clerk and housekeeper, as performed, involved pushing and pulling, but the ALJ found that the pushing and pulling limitation was inconsistent with the treating records and Plaintiff's testimony that she had no problems using her arms, hands, and fingers.  (*Id.*)

**D.    Application**

Plaintiff moves for judgment on the pleadings, arguing that the ALJ failed to properly: (i) weigh the medical evidence and develop the record; (ii) evaluate Plaintiff's RFC; (iii) evaluate the vocational expert testimony; and (iv) evaluate Plaintiff's credibility.  (Pl. Mem at 1.)  The Commissioner also moves for judgment on the pleadings, seeking affirmance of the Commissioner's determination that the ALJ properly weighed the medical evidence and evaluated Plaintiff's testimony.  (*See* Mem. of Law in Supp. of Def.'s Mot. for J. on the Pleadings ("Def. Mem.") at 1, Doc. Entry No. 16.)  Defendant's motion is denied and Plaintiff's motion is granted based on the discussion below.

1.    <u>Treating Physician Rule and Failure to Develop a Full Record</u>

Plaintiff argues the ALJ improperly: (1) evaluated the findings and opinions of Plaintiff's treating physicians, Drs. Gray and Haroon; (2) improperly gave the opinions of the consulting physicians greater weight than the treating physicians; and (3) substituted her own medical judgment for the treating physician's professional opinion, rather than develop the record.  (Pl. Mem. at 16-25.)  The Commissioner argues the ALJ properly: (1) found that Plaintiff was capable of performing light work despite physical limitations; (2) interpreted the Plaintiff's MRIs, reports of reduced range of motion, and other laboratory tests; (3) accorded little weight to Drs. Gray and Haroon's opinions because they were not consistent with the record; and (4) gave

controlling weight to the consulting psychologist. (Def. Mem. at 18-21.) The Court finds that the ALJ erred in applying the treating physician rule.

A treating source's medical opinion on the nature and severity of the impairment is given controlling weight when it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Schisler v. Sullivan*, 3 F. 3d 564, 567 (2d Cir. 1993) (citing 20 C.F.R. § 404.1527(d)). With respect to "the nature and severity of [a claimant's] impairment(s)," 20 C.F.R. § 404.1627(d)(2), "[t]he SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." *Green-Younger v. Barnhart*, 335 F. 3d 99, 106 (2d Cir. 2003). The Second Circuit has noted that "[w]hile the opinions of a treating physician deserve special respect . . . they need not be given controlling weight where they are contradicted by other substantial evidence in the record." *Lazore v. Astrue*, 443 F. App'x 650, 652 (2d Cir. 2011) (quoting *Veino v. Barnhart*, 312 F. 3d 578, 588 (2d Cir. 2002)). Where a treating source's opinion is not given controlling weight, the proper weight accorded by the ALJ depends upon several factors, including: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." *Clark v. Comm'r of Social Sec.*, 143 F. 3d 115, 118 (2d Cir. 1998); *see also* 20 C.F.R. § 404.127(c)(2).

Along with the treating physician rule, the ALJ has an affirmative duty to develop a full and fair record. *See Tejada v. Apfel*, 197 F. 3d 770, 774 (2d Cir. 1999); 20 C.F.R. § 404.1512(d)-(f) (setting forth the affirmative obligations of ALJs). Plaintiff's claim can be remanded to the Commissioner "[w]here there are gaps in the administrative record." *Rosa v.*

*Callahan*, 168 F. 3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). ALJs have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature for the proceedings." *Tejada v. Apfel*, 167 F. 3d 770, 774 (2d Cir. 1999).

Here, in deciding what weight to give Plaintiff's treating physicians, the ALJ did not consider all of the factors as required in 20 C.F.R. § 404.1527(c)(2). The ALJ did address the first factor, finding that Plaintiff saw Dr. Gray, the treating, board-certified orthopedic surgeon, on only two occasions. (R. 20, 22.) However, the ALJ then gave the findings of the consultative examiner, Dr. Tranese, controlling weight, despite the fact that he examined Plaintiff only once and had no board certification or specialization. (R. 23); *see* 20 C.F.R. § 416.927(d)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.")

In addition, the ALJ substituted her own judgment instead of fulfilling her duty to contact the treating physicians and develop the record. The Second Circuit has held that "[n]either the trial judge nor the ALJ is permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion." *Shaw v. Carter*, 221 F. 3d 126, 134-35 (2d Cir. 2008).

The ALJ dismissed Dr. Gray's diagnosis of spinal stenosis because "there is no evidence of such an injury," without further explanation or development of the record. (R. 22.) According to the record, Dr. Gray diagnosed Plaintiff based upon clinical findings and an MRI. (R. 398-400.) He repeated his findings in a January 31, 2011 letter to the Appeals Council, stating Plaintiff had developed "some stenosis," which he found "via MRI for cervical spine." (R. 421.) The ALJ found that Dr. Gray's opinion that Plaintiff could carry twenty pounds occasionally was inconsistent with his opinion that she could only lift ten pounds occasionally.

(R. 20, 401-02.) Therefore, when determining the RFC, the ALJ gave significant weight only to Dr. Gray's opinion that Plaintiff could carry twenty pounds occasionally, and disregarded the rest of his findings, concluding: "[T]his is reasonable considering the claimant's cervical impairment." (R. 22.) Once again, the ALJ, a lay person, substituted her "medical experience," instead of contacting the treating physician for an explanation. The ALJ similarly dismissed the opinions of Plaintiff's treating psychiatrist, Dr. Haroon, and failed to give her Psychiatric/Psychological Impairment Questionnaire and Multiple Impairment Questionnaire significant weight, because "they are not supported by the treating records." (R. 22-23.) The ALJ found Dr. Haroon failed to state the frequency of Plaintiff's symptoms or explain inconsistencies between the July 8, 2009 and the April 10, 2010 questionnaires, but did not contact Dr. Haroon to develop the record.

Lastly, the ALJ failed to draw a distinction between activities Plaintiff could perform in her daily life and limitations Plaintiff would face in a work setting. When considering Dr. Gray's restrictions and limitations report that concluded claimant could sit one hour and stand and walk for two hours, the ALJ found these conditions meant Plaintiff was essentially "housebound." (R. 22.) Since Plaintiff was not, the ALJ dismissed Dr. Gray's opinion as to Plaintiff's restrictions and limitations. (*Id.*) In so doing, the ALJ noted Plaintiff had testified to driving her children to school, shopping, and doing household tasks: "[a]n individual with such limitations as reported by Dr. Gray would be unable to engage in such activities." (*Id.*) However, the ALJ failed to consider that Dr. Gray found these restrictions and limitations applied if Plaintiff was placed "in a normal competitive five-day a week work environment on a sustained basis." (R. 401.)

Plaintiff correctly asserts that the fact Plaintiff did some cleaning and cooking around the house, drove her children to school, and shopped with her husband was neither "inconsistent with Dr. Gray's opinion, nor is it incompatible with a claim of disability," because "[s]he performs these activities at her own pace and outside of a competitive work environment, without answering to an employer." (Pl. Mem. at 19); *see also Balsamo v. Chater*, 142 F. 3d 75, 81 (2d Cir. 1998) ("Claimant need not be an invalid to be found disabled under the Social Security Act.") The ALJ similarly dismissed Dr. Haroon's finding that Plaintiff was markedly limited in the ability to complete a normal workweek, because Dr. Haroon had found Plaintiff only mildly or moderately limited in other categories and because Plaintiff took care of her children. (*Id.*)

The ALJ failed to develop the record after finding a lack of explanation and clinical evidence for the treating psychiatrist's opinions, and, instead, gave those opinions no significant weight. "When the ALJ perceives a gap in the record concerning the findings of the treating physician, the ALJ has an affirmative duty to seek out such information." *Schaal*, 134 F. 3d at 505. Accordingly, upon remand, the ALJ is directed to give proper weight to the medical evidence, refrain from inserting her own medical view in place of the opinions of the treating physicians, and develop the record.

2.    <u>Proper Evaluation of Plaintiff's RFC</u>

The ALJ's duty to develop the record includes ensuring that the record as a whole is complete and detailed enough to allow the ALJ to determine Plaintiff's RFC. *Casino-Ortiz v. Astrue*, 2007 WL 27545794, at *7 (S.D.N.Y. Sept. 21, 2007), *report and recommendation adopted by* 2008 WL 461375 (S.D.N.Y. Feb. 20, 2008). An RFC determination indicates the most an individual can do despite her impairments. *See* 20 C.F.R. § 404.1545(a). An

individual's RFC takes into consideration her physical and mental limitations, symptoms (including pain) and all other relevant evidence in the case record. *Id.* Specifically, with respect to physical abilities, the RFC assessment includes consideration of an individual's exertional capabilities, including her ability to sit, stand, walk, lift, carry, push, and pull. 20 C.F.R. § 404.1545(b). Non-exertional limitations or restrictions, including manipulative or postural limitations, such as reaching handling, stooping, or crouching, are also considered. *Id.*

In light of the Court's findings that the ALJ failed to properly evaluate the treating physician's opinions, especially as to Plaintiff's limitations in a normal work setting, and to develop the record, the ALJ should revaluate her RFC. (*See supra* Section III-A.) This is particularly important because, in determining the RFC, "[t]he ALJ must also discuss the claimant's ability to perform these functions in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each *work-related activity* the individual can perform based on the evidence available in the case record." *Hilsdorf v. Comm'r of Social Sec.*, 724 F. Supp. 2d 330, 348-49 (E.D.N.Y. 2010) (internal citations omitted) (emphasis added).

In addition, the ALJ improperly gave greater weight to the opinions of consulting physician, Dr. Tranese, when determining the RFC. The ALJ explained the reason for giving Dr. Tranese's medical source statement significant weight was that it was consistent with her RFC. (R. 24.) Such reasoning is circular and flawed. The ALJ should use medical opinions to determine Plaintiff's RFC, and, therefore, cannot give medical opinions weight based on their consistency with the RFC.

Furthermore, the ALJ gave significant weight to Dr. Tranese even though she acknowledged that his medical source statement did not contain the terminology used in the

regulations. (R. 24.) Dr. Tranese provided moderate and mild limitations for certain activities, without stating how long Plaintiff could perform work-like activities or how much weight she could carry or lift. (R. 280.) "While the opinions of treating or consulting physicians need not be reduced to any particular formula. . . . [the consultative examiner's] use of the terms "moderate" and "mild," without additional information, does not permit the ALJ, a layperson notwithstanding her considerable and constant exposure to medical evidence, to make the necessary inference that [Plaintiff] can perform the exertional requirements of sedentary work." *Hilsdorf*, 724 F. Supp. 2d at 347-48. Accordingly, upon remand, the ALJ shall develop the record to adequately determine Plaintiff's RFC by requesting medical opinions from Plaintiff's treating physicians to fill any gaps that the ALJ found when assessing Plaintiff's limitations.

### 3.  Proper Evaluation of Vocational Evidence

Plaintiff further argues that the ALJ attempted to suppress the VE's testimony regarding her observations that the jobs of housekeeper and mail clerk involved pushing and pulling, even if the DOT stated otherwise. (Pl's Mem. at 23-24.) The record does not support such a claim. (R. 69 ("ALJ: She has said in her opinion, seeing the way it's performed, she sees that there is pushing and pulling. Is that what you're saying? VE: Yes"); *see also* R. 25 (ALJ acknowledged the VE's opinion on pushing and pulling in her decision).) Moreover, the ALJ ultimately found that Plaintiff did not have limitations as to pushing and pulling. The Court finds that the ALJ properly evaluated the vocational evidence in light of her RFC assessment.

However, as discussed above, the ALJ's RFC analysis was flawed and based on an incomplete record. To determine a claimant's RFC, the ALJ is permitted to rely on a VE's testimony regarding a hypothetical provided the facts of the hypothetical are based on substantial evidence, and accurately reflect the limitations and capabilities of the claimant. *See Dumas v.*

*Schweiker*, 712 F. 2d 1545, 1553-54 (2d Cir. 1983). On remand, should the ALJ find that Plaintiff does have limitations as to pushing and pulling, the ALJ should reassess the VE's testimony when determining, at step five, whether there is alternative gainful work that exists in the national economy.

4.    Plaintiff's Credibility

The Second Circuit recognizes that subjective allegations of pain may serve as a basis for establishing disability. *Taylor v. Barnhart*, 83 F. App'x 347, 350 (2d Cir. 2010). However, the ALJ is afforded discretion to assess the credibility of a claimant and is not "required to credit [Plaintiff's] testimony about the severity of her pain and the functional limitations it caused." *Correale-Englehart v. Astrue*, 687 F. Supp. 2d 396, 434 (S.D.N.Y. 2010) (quoting *Rivers v. Astrue*, 280 F. App'x 20, 22 (2d Cir. 2008)). In determining Plaintiff's credibility, the ALJ must adhere to a two-step inquiry set forth by the regulations. *See Peck v. Astrue*, 2010 WL 3125950, at *4 (E.D.N.Y. Aug. 6, 2010). First, the ALJ must consider whether there is a medically determinable impairment that could reasonably be expected to produce the pain or symptoms alleged. 20 C.F.R. § 404.1529(b); S.S.R. 96-7p. Second, if the ALJ finds that the individual suffers from a medically determinable impairment that could reasonably be expected to produce the pain or symptoms alleged, then the ALJ is to evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which they limit the individual's ability to work. *Id.*

Where the ALJ finds that the claimant's testimony is not consistent with the objective medical evidence, the ALJ is to evaluate the claimant's testimony in light of seven factors: 1) the claimant's daily activities; 2) the location, duration, frequency, and intensity of the pain; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any

medications taken to alleviate the pain; 5) any treatment, other than medication, that the claimant has received; 6) any other measures that the claimant employs to relieve the pain; and 7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain. 20 C.F.R. § 404.1529(c)(3)(i)-(vii).

"If the ALJ rejects plaintiff's testimony after considering the objective medical evidence and any other factors deemed relevant, [she] must explain that decision with sufficient specificity to permit a reviewing court to decide whether there are legitimate reasons for the ALJ's disbelief." *Correale-Englehart*, 687 F. Supp. 2d at 435. Where the ALJ neglects to discuss at length her credibility determination with sufficient detail to permit the reviewing court to determine whether there are legitimate reasons for the ALJ's disbelief and whether her decision is supported by substantial evidence, remand is appropriate. *Id.* at 435-36; *see also Grosse v. Comm'r of Social Sec.*, 2011 WL 128565, at *5 (E.D.N.Y. Jan. 14, 2011) (finding the ALJ committed legal error by failing to apply factors two through seven); *Valet v. Astrue*, 2012 WL 194970, at *22 (E.D.N.Y. Jan. 23, 2012) (remanding because the ALJ failed to address all seven factors).

The ALJ found that Plaintiff has a medically determinable impairment that could cause her alleged symptoms, but that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 14.) The requirements of 20 C.F.R. § 404.1529(c)(4) provide that the ALJ must make a credibility assessment before making a RFC assessment, because the credibility assessment is used to determine Plaintiff's limitations and RFC. Therefore, the ALJ cannot claim that Plaintiff's testimony is not credible because it is inconsistent with the RFC, when that testimony, in part, should be used to determine the RFC.

On remand, the ALJ should determine Plaintiff's credibility before, and independently from, the RFC determination.

In addition, the ALJ failed to consider that Plaintiff's ability to engage in certain daily activities does not necessarily mean she lacks credibility as to the severity of her symptoms. Her ability to drive occasionally and take her children to school or perform "mundane tasks of life . . . do not necessarily indicate that [a claimant] is able to perform a full day of sedentary work." *Martin v. Astrue*, 2009 WL 2356118, at *12 (S.D.N.Y. July 8, 2011) (citing *Balsamo*, 142 F. 3d at 81 (claimant who sometimes drives a car, attends church, and helps wife with shopping may still be unable to perform sedentary work)).

Lastly, as discussed above, there were gaps in the treating physician and psychiatrist's assessment and the ALJ failed to fulfill her affirmative duty to develop the record. Therefore, while the ALJ addressed the seven factors outlined in the statute, she based the Plaintiff's credibility on an incomplete and improper evaluation of the record.

## CONCLUSION

For the foregoing reasons, the Commissioner's motion is denied and Plaintiff's motion for judgment on the pleadings is granted to the extent that, pursuant to the fourth sentences of 42 U.S.C. § 405(g), the Commissioner's decision is reversed and this matter is remanded to the Commissioner for further administrative proceedings consistent with this opinion. Specifically, on remand, the ALJ is directed to: (a) give proper weight to the medical evidence of the treating physicians; (b) refrain from inserting her own medical view in place of the opinions of the treating physicians; (c) request additional information regarding Dr. Haroon's questionnaires and Dr. Gray's Spinal Impairment Evaluation where the ALJ finds lack of support for their opinions; and (d) based on additional information received from the treating physicians, determine Plaintiff's RFC and reassess Plaintiff's credibility.

SO ORDERED.

Dated: Brooklyn, New York
March 28, 2013

_____/s/_____
DORA L. IRIZARRY
United States District Judge